United States District Court
Southern District of Texas
**ENTERED**
August 07, 2019
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. 5:19-CR-371 |
| | § | |
| MATILDE ALANIS-CUELLAR | § | |

## REPORT AND RECOMMENDATION

Defendant Matilde Alanis-Cuellar has been indicted for one count of conspiracy to transport illegal aliens into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(I) and three counts of attempted transport of illegal aliens into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II). (Dkt. No. 24). Now pending before the Court is Defendant's Opposed Motion to Suppress Evidence ("Motion to Suppress") (Dkt. No. 31). Defendant's motion presents three primary issues: (1) whether Defendant's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny were "scrupulously honored"; (2) whether Defendant's confession was knowing and voluntary; and (3) whether Defendant's statements were obtained in violation of the presentment rule. (*See* Dkt. No. 31 at 3).

Defendant's Motion to Suppress has been referred to this Court by the District Judge for findings of fact and recommendations of law. (Dkt. No. 33). After referral from the District Judge, the Court held an evidentiary hearing on Defendant's Motion to Suppress at which the Government presented the testimony of Border Patrol Agents James Bowser, Victor Rivera-Cortes, and Juan Lopez. After the Government presented its case, the Court received testimony from Defendant. At the hearing's conclusion, the Court ordered additional briefing from both parties. Pursuant to 28 U.S.C. § 636(b)(3), the Court submits the following Report and Recommendation; and based on the parties' briefs, the evidence presented at the hearing, and the reasons stated below, the Court recommends that Defendant's Motion to Suppress (Dkt. No. 31) be **DENIED**.

1

## I.   Findings of Fact

### A.  The Arrest

On March 27, 2019, sometime after 8:00 p.m., a team of United States Border Patrol agents ("BPAs") posted in static position by the Rio Grande River encountered a group of approximately twenty individuals suspected of having entered the United States illegally near Laredo, Texas. (Dkt. No. 31 at 2; Dkt. No. 43 at 20).[1] There were approximately six Border Patrol personnel on the scene. (Dkt. No. 43 at 13, 25). Of the twenty individuals the BPAs spotted in the brush, the agents were able to apprehend sixteen. (Dkt. No. 31 at 2; Dkt. No. 43 at 22). By about 8:45 p.m., the BPAs gathered all the detainees in a single location and began conducting field immigration inspections, which involved a pat down and search of each individual for officer safety, and recording each individual's name, date of birth, and country of origin onto a field inspection form. (*See* Dkt. No. 43 at 22, 24). During the inspections, several individuals admitted that they had just crossed the Rio Grande River and had entered the United States illegally. (Dkt. No. 31 at 2). BPAs determined that all sixteen individuals entered the United States illegally. (Dkt. No. 43 at 27). The six BPAs present simultaneously performed field immigration inspections on the detainees, each inspection lasting three to five minutes. (*Id.* at 24–25). Within thirty minutes, all sixteen field immigration inspections had been completed. (*Id.* at 30–31).

After completing the inspections, a Border Patrol van arrived to transport the detainees to the Laredo South Border Patrol Station, but the lone van lacked the capacity to transport the entire group of sixteen. (*Id.* at 25–26). While standard Border Patrol protocol dictated that the BPAs wait for another transportation van to arrive—potentially resulting in another thirty- to ninety-minute delay—the agents in the field used several of their unit vehicles to transport the remaining

---

[1]   All citations to the hearing transcript refer to the CM/ECF designation, not the transcript's original pagination.

detainees to the Laredo South station. (*Id.* at 26). Securing the BPAs' vehicles, parked a mile away, added an additional ten to fifteen minutes to the transportation process. (*Id.* at 31–32). The BPAs arrived with the group of sixteen aliens at the Laredo South station sometime between 10:00 p.m. and 10:30 p.m.[2]

### B.  The Border Patrol Station

When the group arrived at the Laredo South station, a shift change among Border Patrol agents was taking place. (Dkt. No. 43 at 44). At the same time, other detainees were being processed at the station. (*Id.* at 46). As part of the screening process, the aliens were questioned again about their biographical information. (*Id.* at 42). During this time, the aliens waited on a bench inside the station, in the presence of other BPAs. (*Id.* at 89–90). At some point, Defendant was asked by Border Patrol whether he wanted anything to eat, but he only requested to use the bathroom. (*Id.* at 148).

Next, the aliens underwent initial processing. Three or four BPAs were assigned to the task, but two others, BPAs Juan Lopez and Victor Rivera-Cortes, members of separate units,[3] assisted with intake to expedite the process. (*See* Dkt. No. 35 at 2; Dkt. No. 43 at 44–45). One by one, the aliens were patted down and searched. (Dkt. No. 43 at 43). If an alien possessed money, the money was counted in front of him, and he would sign a Form I-213 confirming the amount of money in his possession. (*Id.* at 73). If the individual had any other property on his person, such as a cell phone or religious items, that property would be placed in a bag and the tracking number

---

[2]  All three Border Patrol agents testified that the group of sixteen aliens arrived at the Laredo South station sometime close to 10:30 p.m., based on the fact that the U.S. Border Patrol's so-called "midnight shift," which actually begins at 10:00 p.m., was already present at the Laredo South station by the time the group of sixteen had arrived. (Dkt. No. 43 at 34, 42, 100).

[3]  BPA Rivera-Cortes was assigned to the Alien Smuggling Identification Team (*id.* at 37) and BPA Lopez was assigned to Collateral Intelligence. (*Id.* at 96).

would also be recorded on the Form I-213. (*Id.* at 43, 73). Photographs were taken of each of the aliens, and everyone over fourteen years old had his fingerprints scanned. (*Id.* at 47, 100). The information obtained was entered into the Border Patrol's electronic database and used to retrieve criminal history and any records of prior apprehensions by Border Patrol. (*Id.* at 47).

The group of sixteen aliens was one of the largest groups the Laredo South station had ever received. (Dkt. No. 43 at 106). A typical group of detainees consists of six to eight aliens. (*Id.* at 46). Given the size of the group, BPAs Rivera-Cortes and Lopez suspected that one of the sixteen individuals was a brush guide and suspected that Defendant, specifically, was the brush guide for the group.[4] (*Id.* at 48). He was the only person in the group from Nuevo Laredo,[5] and he was dressed differently than the other aliens. (*Id.* at 48–49, 91). As is standard Border Patrol operating procedure, Defendant was placed in an isolated cell. (*Id.* at 50, 105).[6]

Defendant was later removed from his cell and escorted to BPA Rivera-Cortes's desk. (*See id.* at 65). BPA Rivera-Cortes attempted to confirm Defendant's biographical information because Defendant's profile was not showing up in the Clave Única de Registro de Población (commonly referred to as the "CURP"), an electronic database maintained by the Mexican government in which each Mexican national is registered. (*See id.* at 61). BPA Rivera-Cortes made several attempts in Defendant's presence to pull up Defendant's information based on the biographical

---

[4] If the arresting agents in the field had suspected Defendant of being the brush guide, this suspicion was not communicated to the processing agents at the Laredo South station. (*Id.* at 32, 71–72, 91, 118–19).

[5] BPA Rivera-Cortes explained that "the Cartel hub of Los Zetas is . . . in Nuevo Laredo. And a lot of people, usually young people, get employed there to . . . [engage in] criminal activity, . . . [such as] smuggling, drug trafficking, [etc.]" (Dkt. No. 43 at 48). BPAs were also suspicious that Defendant was the brush guide because he was the only one in the group wearing shorts, did not otherwise appear to be dressed to travel for a long time, and was not otherwise carrying much property. (*See id.* at 48–49; *see* Dkt. No. 35 at 2).

[6] A suspected brush guide is typically placed in a cell separate from the remainder of a group to prevent him from intimidating or otherwise coercing potential material witnesses against cooperating with the agents. (Dkt. No. 43 at 49–50).

information he provided, but to no avail. (*See id.* at 65–66). BPA Rivera-Cortes told Defendant

that he suspected he was lying about his age. (*Id.* at 66–67). BPA Rivera-Cortes eventually showed

Defendant his computer screen indicating that the information was not showing up in the system,

after which Defendant gave his correct date of birth. (*Id.* at 66).[7] Once the correct date of birth was

entered, Defendant's profile appeared in the CURP. (*Id.* at 66). Defendant's delay in providing the

correct date of birth added approximately twenty minutes to his intake processing. (*Id.* at 64).

Defendant was not Mirandized at this point, nor did he invoke any *Miranda* rights. (*Id.* at 56–57,

114). He was not questioned further and was returned to his cell. (*Id.* at 99–100). It took between

one and two hours to complete the intake process for the entire group. (*Id.* at 44).

Sometime between 11:00 p.m. and midnight, after the completion of the intake process and

a review of the record check information, the BPAs began to conduct individual interviews. (*Id.* at

44, 106–07). Aside from the Defendant, twelve of the sixteen aliens were interviewed.[8] (*Id.* at

107). BPAs Rivera-Cortes and Lopez were the only agents conducting interviews of the group.

(*Id.* at 107). While under normal circumstances both agents would be present during each one of

the interviews, BPAs Rivera-Cortes and Lopez decided to split the duties to expedite the process.

(*See id.* at 107–08). Thus, Agent Lopez conducted the interviews mostly on his own. (*Id.* at 51).

The time each interview took to complete varied, but each interview lasted on average between

thirty and forty-five minutes.[9] (*Id.* at 54). Meanwhile, Agent Rivera-Cortes prepared six-pack

---

[7] The date of birth provided by Defendant confirmed he was eighteen years old. (Dkt. No. 43 at 66). The false date of birth Defendant previously provided made him a seventeen-year-old juvenile. (*Id.* at 66). A common tactic used by younger brush guides is to portray themselves as juveniles given the increased likelihood that they will avoid prosecution. (*See id.* at 61–62).

[8] The three detainees from the group not interviewed were a mother and her two juvenile children, otherwise referred to by Border Patrol as a "family unit." (Dkt. No. 43 at 107). Per Border Patrol policy, family units are not interviewed or recruited as material witnesses. (*Id.* at 53). In addition, family units are placed in cells with other family units. (*See id.* at 75).

[9] Lopez, the BPA conducting the interviews, estimated that each interview took between thirty and forty-five minutes to complete. Rivera-Cortes, who completed the administrative paperwork after each witness interview

photo lineups (*id.* at 51), reviewed records checks (*id.* at 51), sat-in on portions of interviews (*see id.* at 2), and drafted narrative summaries of the completed interviews onto a Form D-166. (*Id.* at 51, 79). BPA Rivera-Cortes testified that he did not take a break during his shift. (*Id.* at 54). Agent Lopez, on the other hand, took a twenty-minute lunch break. (*Id.* at 111).

When an individual is suspected of being a guide for undocumented aliens, the BPAs interview all the other witnesses first to establish the facts of the case, prior to speaking to the suspect. (*See* Dkt. No. 35 at 2; Dkt. No. 43 at 109). Defendant was therefore interviewed last. (*Id.*).

### C. The Subject Interview

Defendant's interview took place at 4:00 a.m. on March 28, 2019. (Gov't Ex. 2). BPAs Lopez and Rivera-Cortes were both present for Defendant's interview. (Dkt. No. 43 at 81). BPA Lopez began by confirming with Defendant that his preferred language was Spanish. (*Id.* at 112). BPA Lopez then read the *Miranda* rights listed on Form I-214 to Defendant in Spanish. (Dkt. No. 43 at 85, 111–12; Gov't Ex. 2). The notice of rights on the Form I-214 are presented in Spanish. (Gov't Ex. 2). Upon his request, Defendant was provided with the Form I-214, which he read over himself. (*See* Dkt. No. 43 at 83–84). BPA Lopez then asked Defendant whether he understood his rights. (*Id.* at 127). Defendant said that he did and that he was willing to answer questions. (*Id.* at 112–13, 127–28). BPA Lopez asked Defendant whether he wished to have a lawyer present and remain silent or would he answer some questions; and Defendant agreed to answer Agent Lopez's questions. (*See id.* at 84–85, 112–13). Defendant signed the Form I-214 indicating that he read the notice of rights, that he was willing to answer questions, and that he did not wish to have an attorney present. (*Id.* at 112; Gov't Ex. 2). At the time Defendant waived his *Miranda* rights, he showed no signs of confusion. (Dkt. No. 43 at 134). During the hearing, Defendant confirmed that

---

was completed, estimated that the interviews took between twenty and thirty minutes, with one interview lasting closer to an hour. (*Id.* at 54).

he was able to read and write in Spanish (*id.* at 132); that he completed school up to the age of sixteen, receiving passing grades in all of his courses (*id.* at 136); that he had read over the Form I-214 (*id.* at 146); and that he had signed the form. (*Id.* at 140; Gov't Ex. 2).

The interview lasted for approximately forty-five minutes. (Dkt. No. 43 at 114). Agents asked about Defendant's background and his reason for traveling to the United States. (*Id.* at 115). Defendant initially claimed that he had entered the United States with a relative and denied being the brush guide of the group. (*Id.* at 67, 115). When Defendant was confronted with the information gathered from the material witnesses and told that he was suspected of engaging in human trafficking, he verbally confessed that he was the group's brush guide. (*Id.* at 67, 114). The confession occurred twenty- to twenty-five minutes into the interview. (*Id.* at 115). At no point did Defendant invoke his right to remain silent. (*Id.* at 61, 108). At no point did Defendant request an attorney. (*Id.* at 61, 108). BPA Lopez and BPA Rivera-Cortes denied ever suggesting to Defendant that telling the truth would result in leniency.[10] (*Id.* at 89, 128). At some point after Defendant confessed, Defendant asked the BPA agents how much jail time he was facing. (*Id.* at 114–15). The BPA agents told him he was facing three to five years in jail,[11] but that the final determination was up to a judge. (*Id.* at 68, 114–15).

BPA Lopez then prepared a Form I-215B sworn statement. (*Id.* at 86–87). The form was written in English and organized in a question-and-answer format, memorializing the specific questions that BPA Lopez had asked Defendant and Defendant's corresponding responses. (*Id.* at 86–87). BPA Lopez went over the form with Defendant, page by page, explaining in Spanish what

---

[10] On the contrary, when BPA Rivera-Cortes was asked whether he told Defendant that he could help himself by telling the truth, he bluntly replied, "No . . . that wouldn't make any difference. No." (Dkt. No. 43 at 89).

[11] BPA Rivera-Cortes recalled telling Defendant that he was facing three to four years (*id.* at 68), while BPA Lopez recalled telling Defendant he was facing three to five years. (*Id.* at 114).

he had written down. (*Id.* at 131). Defendant initialed each page of the form to indicate that he

adopted its contents. (*See id.* at 131). The process took about fifteen minutes. (*Id.* at 132–33).[12]

The proposed complaint was filed later that day. (Dkt. No. 1). On March 29, 2019, Defendant

made his initial appearance before Magistrate Judge Sam Sheldon. (*See* Minute Entry dated March

29, 2019).

## II.   <u>Analysis</u>

Defendant's Motion to Suppress raises three principal issues: (1) whether Defendant's

*Miranda* rights were "scrupulously honored", (2) whether Defendant's confession was knowing

and voluntary; and (3) whether Defendant's statements were obtained in violation of the

presentment rule. The Government does not dispute that Defendant was in custody at the time he

was interrogated, nor that Defendant was entitled to *Miranda* warnings prior to his interrogation.

(*See* Dkt. No. 31 at 3). The issues raised by the Motion to Suppress are addressed in turn.

### A.   **Whether Defendant's *Miranda* Rights were Violated**

#### 1.   ***Miranda* Rights Overview**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal

case to be a witness against himself." U.S. Const. amend. V; *Malloy v. Hogan*, 378 U.S. 1, 8

---

[12] Defendant presents a significantly different factual account regarding his detention and interrogation from the time he arrived at the Laredo South station, as follows: Defendant was separated from the group twenty minutes after arriving at the station. (*Id.* at 142). He was then interrogated on three separate occasions by the BPAs. He could not recall how long it took before the first interrogation occurred, but noted that he did not fall asleep in the interim because he was cold and the BPAs ignored his requests for a blanket. (*See id.* at 142). The first time he was interrogated, after the BPAs read his rights, he invoked his right to remain silent in Spanish. The BPAs, however, told him it would be better for him if he cooperated. (*Id.* at 138). The BPAs also told him he was facing three to five years in jail, which surprised Defendant. (*Id.* at 138). Defendant was then returned to his cell. An hour or two later, Defendant was again questioned by the BPAs. (Dkt. No. 31 at 2). Defendant was provided a copy of the Form I-214 to review, which he read and signed. (Dkt. No. 43 at 140). The BPAs advised him of his right to an attorney. (*Id.* at 140). Defendant again invoked his right to remain silent. (Dkt. No. 31 at 2). Defendant invoked his right to an attorney during either the first or second interview. (*Id.* at 148). The BPAs persisted, however, and reminded him that while he was facing three to five years in jail, he could receive much less time if he cooperated. (Dkt. No. 43 at 147). Defendant's testimony was not clear, but per his motion, this is the point at which he confessed to being the brush guide. (Dkt. No. 31 at 3). He was placed back in his cell. He was then taken out of his cell a third time, during which the BPAs requested his biographical information. (Dkt. No. 43 at 134).

(1964). This provision—the Self-Incrimination Clause—protects the right of the accused to not bear witness against himself at trial. "The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants." *Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990)). To protect against violations of the Self-Incrimination Clause, the Supreme Court announced a prophylactic rule in *Miranda v. Arizona*, whereby the failure to give suspects specific warnings will create a generally irrebuttable presumption of coercion. 384 U.S. 436 (1966).

*Miranda* decrees that any person subjected to custodial interrogation must invariably be given four constitutionally mandated warnings, namely:

> [The person] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479. All four warnings and a waiver thereof are "prerequisites to the admissibility of any statement made by a defendant." *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (citing *Miranda*, 384 U.S. at 476). If an officer were to elicit statements from a suspect in violation of *Miranda*, those statements must generally be suppressed.

### 2. Whether Defendant's *Miranda* rights were "scrupulously honored"

Once *Miranda* warnings are given, if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Michigan v. Mosely*, 423 U.S. 96, 100 (1975) (citing *Miranda*, 384 U.S. at 473–74). If a defendant, in fact, invoked his right to remain silent, his subsequent statements are only admissible if police "scrupulously honored" his right to cut off questioning. *Mosley*, 423 U.S. at 104. Whether a Defendant's rights were "'scrupulously honored' hinges on an unweighted, multifactor test." *Madrid v. Vannoy*, 2018 WL 3968203, at *1 (5th Cir. 2018) (citing *Mosley*, 423 U.S. at 106;

*Charles v. Smith*, 894 F.2d 718, 726 (5th Cir. 1990) ("This case-by-case treatment can produce opposite results in cases that are similar in some respects.")). Such factors include: (1) whether the interrogation ceased immediately after the suspect invoked his right to remain silent, (2) the amount of time between interrogations, (3) whether oral or written warnings were provided and the number of times they were provided, and (4) whether the interrogations addressed the same crime. *See Kelly v. Lynaugh*, 862 F.2d 1126, 1130–31 (5th Cir. 1988).

The facts surrounding Defendant's invocation of his *Miranda* rights are in dispute. The Government asserts that Defendant never invoked his right to remain silent or ever request an attorney. Defendant claims that he invoked his right to remain silent on multiple occasions, and at one point requested an attorney, yet his invocations were ignored. He claims that instead of honoring his right to remain silent or his request for an attorney, the BPAs engaged in coercive tactics, including telling him that "he was lying, . . . that if he told the truth he would be allowed to be given leniency, and . . . that he was going to serve 3–4 years in prison." (Dkt. No. 31 at 5). Such "persis[tent and] . . . repeated efforts to wear down [Defendant's] resistance and ma[ke] him change his mind," if true, would tend to support the proposition that Defendant's *Miranda* rights were not "scrupulously honored." *Lynaugh*, 862 F.2d at 1130–31 (citing *Mosely*, 423 U.S. at 105–06).

Based on the testimony at the suppression hearing, however, the Court finds that Defendant never invoked his right to remain silent or his right to counsel. Both BPAs who interviewed Defendant testified that they were trained in conducting interrogations (Dkt. No. 43 at 70, 96), that they had conducted multiple interrogations prior to Defendant's (*id.* at 59, 116), and that their invariable response to a suspect invoking his *Miranda* rights is to terminate the interrogation immediately. (*Id.* at 60, 113). In addition, BPA Rivera-Cortes testified that it would have personally benefited him if Defendant had chosen not to answer questions as it would have

10

eliminated the need to prepare additional paperwork. (*Id.* at 60). Having weighed the conflicting testimony, the Court finds no basis to doubt the credibility of BPA Rivera-Cortes or BPA Lopez. The Court finds that Defendant did not invoke his *Miranda* rights; and therefore there was no failure to "scrupulously honor" Defendant's assertion of his right to remain silent or his right to an attorney.

### B. Whether Defendant's Confession was Knowing and Voluntarily

"A confession is voluntary if it is the product of the defendant's free and rational choice; it is voluntary in the absence of official overreaching, either by direct coercion or subtle psychological persuasion." *United States v. Mullin*, 178 F.3d 334, 341 (5th Cir.1999) (citing *United States v. Restrepo*, 994 F.2d 173, 183 (5th Cir.1993)). "The voluntariness of a waiver of [*Miranda* rights] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). The Government's burden to establish voluntariness "is not more than the burden to establish waiver by a preponderance of the evidence." *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (citing *Connelly*, 479 U.S. at 168). "Whether a confession is voluntary is determined by considering the 'totality of the circumstances.'" *Connelly*, 479 U.S. at 176.

### 1. Defendant's confession was voluntary

When determining whether a confession was voluntary, "[t]he reviewing court must assess the characteristics of the defendant and the details of the interrogation, such as the youth of the defendant, his level of education, his level of intelligence, the lack of any advice to the defendant of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment, such as the deprivation of food or sleep." *Morales v. Dretke*, 2005 WL 840217, at *5 (N.D. Tex. Apr. 11, 2005) (citing *Schneckloth v. Bustamonte*,

412 U.S. 218, 226 (1973)); *see also Rogers v. Quarterman*, 555 F.3d 483, 491 (5th Cir. 2009).[13] In addition, courts have considered the defendant's criminal history, general familiarity with the criminal justice system, language skills, and the potential influence of any medication, drugs, or alcohol. *See, e.g.*, *United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994); *United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009); *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998).

If a confession is coerced, it is not voluntary. The "presence or absence of coercive behavior on the part of the government" is a "crucial aspect" in the voluntariness analysis. *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005) (citing *United States v. Reynolds*, 367 F.3d 294, 298 (5th Cir. 2004)). In addition to the factors noted above, several principles inform the voluntariness analysis. For instance, a confession is not involuntary merely because a suspect is advised that "there are advantages to cooperating." *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1347–48 (5th Cir. 1994); *see also United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) (asserting that the accused's cooperation would be made known to the court and that the notification of his maximum penalty did not render a subsequent confession involuntary). Rather, "the cooperation of an arrested person often is prompted by a desire for leniency for himself or others," and statements thus made are not per se involuntary. *United States v. Robertson*, 582 F.2d 1356, 1368 (5th Cir. 1978). A promise of leniency may nevertheless be "a factor to consider in determining whether a statement" has been voluntarily made, but indirect or implicit promises have only been attributed a fraction of the "potency" of direct promises and weigh less heavily in the calculation. *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988); *see also Miller v.*

---

[13] Similarly, the Fifth Circuit's Pattern Jury instructions refer to factors like "age, sex, training, education, occupation, and physical and mental condition of the defendant, [the defendant's] treatment while under interrogation, and all the other circumstances in evidence surrounding the making of the statement." Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 1.26.

*Fenton*, 796 F.2d 598, 610 (3d Cir. 1986). Similarly, the threat of a lengthy sentence in the absence of a confession, whether explicit or implicit, will not render a waiver involuntary. *See Ballard*, 586 U.S. at 1063 ("A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will."). That tactic, the Fifth Circuit has explained, is "customary," *Cardenas*, 410 F.3d at 295, and only offers a suspect the opportunity "to make an informed decision" regarding the costs and benefits of cooperating with the government. *Ballard*, 586 F.2d at 1063 (citing *United States v. Barfield*, 507 F.2d 53 (5th Cir.), *cert. denied*, 421 U.S. 950 (1975); *see also United States v. Rico*, 51 F.3d 495, 507 (5th Cir. 1995).

Defendant argues that even if his *Miranda* rights were scrupulously honored, his statements must nonetheless be excluded because they were the product of the BPAs' coercive tactics. The alleged coercive tactics employed by the BPAs include telling Defendant that he was lying about his age (Dkt. No. 31 at 5), that he would receive leniency if he confessed (Dkt. No. 31 at 5), that he was facing three to five years for his crimes (Dkt. No. 43 at 167–68), and that the interrogation took place at 4:00 a.m., seven hours after his arrest. (Dkt. No. 41 at 5). The Court determines that these facts, even taken as true and in their totality, do not support a conclusion that Defendant's confession was coerced.

As noted above, the Court finds that Defendant was given a proper *Miranda* warning only one time prior to his interrogation and that Defendant confessed thereafter. The lack of multiple attempts at interviewing Defendant evinces the absence of coercion. Despite Defendant's contention, the evidence demonstrates that he was told he was lying about his age while his biographical information was taken, well before his interrogation. The purpose of the BPA's efforts at this point were not to interrogate Defendant, but rather to secure his information in the CURP database. Indeed, Defendant did lie about his age. Thus, the Court does not find the BPA's effort to secure Defendant's actual date of birth to be coercive. While the BPAs that interviewed

13

Defendant denied promising him leniency for cooperating, the law does not make a subsequent confession per se invalid even if they had done so. *See Hawkins v. Lynaugh*, 844 F.2d at 1140; *Fenton*, 796 F.2d at 610. As for the prospective length of his sentence, the Court finds it had no effect on Defendant's decision to make a statement because the BPAs only raised the prospect in response to a direct question from Defendant *after* he had already confessed.

Defendant also highlights that he was not interrogated until seven hours after his arrest. While Defendant was isolated during most of this period and potentially uncomfortable due to the building's temperature, nothing in the record indicates that this was a coercive tactic employed by the BPAs.[14] Rather, the record demonstrates the BPAs followed standard protocol in processing an unusually large group of alien detainees and, as a result, Defendant's interrogation was delayed. Finally, once Defendant was interrogated, the questioning lasted approximately twenty-five minutes before he confessed, and the entire interrogation was over in forty-five minutes. Based on the foregoing, the Court finds that Defendant's confession was voluntary.

### 2. Defendant Alanis-Cuellar knowingly waived his *Miranda* rights

For the Defendant's *Miranda* waiver to be valid, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of [his] decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Only when the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly find that the *Miranda* rights have been waived. *Id.*

### a. Defendant was fully aware of the nature of his *Miranda* rights

When considering the "totality of the circumstances" as to Defendant's awareness of the nature of his *Miranda* rights, Courts have found that a description of the rights in written form

---

[14] *See* section III, below, discussing the presentment rule, which provides that under certain circumstances delay can result in the suppression of a voluntary confession, regardless of whether the delay was intended as a coercive tactic.

weighs in favor of knowing waiver, as does presentation of the information in the suspect's native language. *See United States v. Broussard*, 80 F.3d 1025, 1033–34 (5th Cir. 1996) (finding that Spanish-speaking defendant's incriminating statements to police officer were voluntary where defendant was immediately informed of his *Miranda* rights in Spanish, was given opportunity to read Spanish *Miranda* warning card, and was not promised leniency). The suspect's demeanor during questioning may be of particular importance, as a suspect who listens to questions, responds appropriately and logically, and provides information in a logical manner is both likely to understand any warnings given and unlikely to be under the influence of any intoxicants. *See Reynolds*, 367 F.3d at 299. Thus, a suspect's responsiveness to an agent's questions may be "sufficient to show a 'course of conduct indicating waiver' of the right to remain silent." *Berghuis*, 560 U.S. at 386 (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

The facts of the instant case indicate that Defendant was fully aware of his *Miranda* rights and knowingly waived those rights. Defendant was eighteen years old on the day of the interview. (Dkt. No. 43 at 66). BPA Rivera-Cortes's testimony indicated that Defendant had a least some familiarity with the criminal justice system; he had twice before been apprehended. (*Id.* at 86).[15] BPA Lopez testified that Defendant did not appear confused in any way. (*Id.* at 134). Defendant testified that he attended school until the age of sixteen, that he received passing grades in all his courses, and that he was able to read and write in Spanish. (*Id.* at 136–37). Defendant concedes that he was provided his *Miranda* rights in Spanish, both verbally and in writing, that he read his *Miranda* rights in Spanish, and that he signed the Form I-214, which listed all of his *Miranda* rights in Spanish. (*Id.* at 140, 146; Gov't Ex. 2). Based on the foregoing, the Court finds that

---

[15]   Defendant provided a false date of birth to the BPA Rivera-Cortes during initial processing, further evincing some awareness of the implications associated with being arrested as an adult rather than a juvenile. (Dkt. No. 43 at 66).

Defendant was fully aware of the nature of his *Miranda* rights and that he effected a knowing waiver.[16]

### b. Defendant was fully aware of the consequences of his decision to abandon his *Miranda* rights

"The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *see also Oregon v. Elstad*, 470 U.S. 298, 316 (1985) ("The Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness."). Instead, the Supreme Court has explained, the "Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect." *Spring*, 479 U.S. at 574. The *Miranda* warnings protect that privilege by "ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* Awareness of the consequences of waiver is thus not to be confused with awareness of the advisability of waiver—a defendant must merely "know of his available options before deciding what he thinks best suits his particular situation." *Collins v. Brierly*, 492 F.2d 735, 738–39 (3d Cir. 1974); *accord Hearn*, 563 F.3d at 104 ("[Defendant] was fully apprised of her *Miranda* rights and chose to waive those rights by answering the officers' questions.").

As already discussed, Defendant was an eighteen-year-old adult at the time he was questioned. In addition to having his *Miranda* rights read to him in Spanish, he requested to read the rights advisement form, and the BPAs obliged. The form was provided to him in his native language. (Gov't Ex. 2). Afterward, the BPAs asked Defendant whether he understood his rights.

---

[16] Defendant makes much of BPA Lopez's testimony that he was not trained to consider Defendant's age and education when advising him of his *Miranda* rights. (Dkt. No. 41 at 4). However, the amount of training BPA Lopez may have received in this regard has no bearing on whether Defendant in fact understood his rights, or the Court's consideration of Defendant's age and education when balancing the "totality of the circumstances."

Defendant acknowledged that he understood his rights and did not request an attorney. Furthermore, Defendant signed the I-214 acknowledging that he understood his rights. (*Id.*). Thus, the Court finds that Defendant knew he could "choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Spring*, 479 U.S. at 574.

Accordingly, the Court finds that Defendant Alanis-Cuellar knowingly and voluntarily waived his *Miranda* rights prior to his confession.

### C.  Whether Defendant's Statements were Obtained in Violation of the Presentment Rule

Federal Rule of Criminal Procedure 5(a) provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." This is commonly referred to as the "presentment rule." *Corley*, 556 U.S. at 306–07. The Supreme Court held that a violation of Rule 5(a)'s prompt-presentment requirement should result in suppression of any confession obtained during a period of unreasonable delay. *McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957). In 1968, Congress modified the *McNabb–Mallory* framework when it enacted 18 U.S.C. § 3501, which provides that "a court may not suppress a confession made during a six-hour *safe-harbor* period solely due to delay in presentment if the confession was made voluntarily." *United States v. Boche-Perez*, 755 F.3d 327, 333 (5th Cir. 2014) (emphasis added) (citing 18 U.S.C. § 3501(c)).

A presentment rule challenge under *McNabb–Mallory* mandates a two-step analysis. The first step requires that the district court determine whether the confession was obtained within six hours of arrest.[17]

> *McNabb–Mallory* concerns itself with 'the time of confession, not the time of first appearance.' If that period is shorter than six-hours, or alternatively, any extension of the safe harbor 'considering the means of transportation and the distance to be

---

[17] "The *McNabb–Mallory* clock starts to run from when the obligation to take the defendant before the federal magistrate arises, to the point at which the confession was rendered." *Boche-Perez*, 755 F.3d at 336 (citations omitted).

> traveled to the nearest available such magistrate judge or other officer,' [as provided
> for in] 18 U.S.C. § 3501(c), then the *McNabb–Mallory* inquiry is at an end.

*Boche-Perez*, 755 F.3d at 336 (citations omitted).

The record demonstrates that Defendant was arrested on the evening of March 27, 2019 around 8:45 p.m. and was not interrogated until the morning of March 28, 2019, at approximately 4:00 a.m. His oral confession was made around 4:25 a.m. and interview was completed by 4:45 a.m. Thus, with respect to the first inquiry, the Government concedes that Defendant's confession was not secured within six hours of his arrest and that § 3501(c)'s "safe harbor" provision does not apply.

The second step is to determine "whether the causes of the delay were justifiable under the *McNabb–Mallory* cases." *Id.* at 336. If the delay is determined to have been unreasonable or unnecessary, the confession must be suppressed, even if it was voluntarily obtained. *See Corley*, 556 U.S. at 322. A delay for the purpose of interrogation "is the epitome of an unnecessary delay." *Id.* at 308 (cleaned up). "Beyond either unexplained delays or purposeful delays for criminal interrogations, courts have been 'careful not to overextend *McNabb–Mallory*'s prophylactic rule in cases where there was a reasonable delay unrelated to any *prolonged interrogation* of the arrestee." *Boche-Perez*, 755 F.3d at 336–37 (emphasis added).

The Fifth Circuit recognizes various forms of reasonable delay, including "delays related to legitimate law enforcement procedures, such as the administrative booking of the arrestee; coordinating with multiple law enforcement agencies or with the U.S. attorney's office; or verifying alibis." *Id.* at 337. Additionally, various other forms of delay have been deemed acceptable, including:

> Delays arising from a shortage of governmental personnel necessary for the initial
> appearance and transportation thereto (such as attorneys, law enforcement, and
> translators) also remain acceptable. For the purposes of determining whether there
> is a shortage of governmental personnel, *McNabb–Mallory* does not require law

enforcement officers to drop everything and rush to the magistrate when doing so would imperil public safety. Moreover, under [*McNabb–Mallory*], the police are not entirely 'forbidden . . . to investigate crime.' As such, law enforcement personnel are permitted, within reasonable limits, to investigate whether the crime occurred; search and secure a premises; and secure, confiscate, or destroy contraband before taking an arrestee to a magistrate. And provided that the defendant agrees to cooperate before a period of unnecessary delay, *McNabb–Mallory* permits officers to translate oral confessions into written confessions, and does not require officers to prematurely terminate an interview.

*Id.* at 337 (citations omitted). The overall reasonableness of a delay is a case-by-case determination. *Id.* at 338. The burden of demonstrating a *McNabb–Mallory* violation is on Defendant. *Id.* at 336. The Court must therefore determine whether the reason for the Government's delay in securing Defendant's confession was justifiable.

Defendant argues that the Government's delay in securing his confession was unjustified because of its unreasonable adherence to internal processes and attendant failure to utilize readily available manpower to expedite those processes. Namely, Defendant claims that he was personally identified as the brush guide by the BPAs in the field prior to being transported to the processing station. (Dkt. No. 43 at 159). With its prime suspect available for immediate questioning, Border Patrol instead chose to follow established protocols for each undocumented alien apprehended that night, before returning to interview Defendant. Moreover, as BPA Rivera-Cortes testified, several BPAs that were not specifically assigned to the intake process the night Defendant was arrested nonetheless assisted with the task due to the unusually large size of the group. (*Id.* at 43–44). Thus, Defendant argues, there was no reason why the witness interviews were completed solely by BPAs Rivera-Cortes and Lopez, when so many other BPAs could have been recruited to assist with the interviews of the group of sixteen undocumented aliens.

The Court finds Defendant's arguments unpersuasive. It cannot be ignored that the six-hour "safe harbor" provision applies whether the circumstances involve the arrest of one suspect or the simultaneous arrest of sixteen or more suspects as part of the same operation. It must be

considered that the purpose of the rule is to protect an incommunicado suspect from having delay and isolation used against him in order to secure a confession. It would therefore be inappropriate to require police officers to ignore established procedures to facilitate a subject interview for no other reason than to beat the clock when processing a large number of suspects. As discussed above, the law expressly allows for such delay.[18]

It is undisputed that Defendant was apprehended with an unusually large group of undocumented aliens and that the BPAs took steps to expedite the processing of such a large group. First, BPA James Bowser testified that after apprehending the individuals on the field, they were moved to a centralized location around 8:45 p.m. The transport van arrived while they were conducting immigration field inspections, and when it became apparent that the transport van was inadequate, rather than wait for another van to arrive, the BPAs in the field took it upon themselves to use their personally assigned vehicles to transport the remaining individuals to the processing station.

As Defendant acknowledges, BPAs that were not assigned to intake that evening were nonetheless recruited to assist at the station. The law does not require Border Patrol to ignore or rewrite its protocols to accommodate a suspect involved in a crime that involves a large group of people. Rather, in a law enforcement environment where safety is paramount, the law expressly recognizes such associated delays as being reasonable. *Boche-Perez*, 755 F.3d at 337 ("*McNabb–Mallory* does not require law enforcement officers to drop everything and rush to the magistrate when doing so would imperil public safety."). While BPAs Rivera-Cortes and Lopez were the only two agents to conduct interviews, they improvised to expedite the process. Whereas normally they

---

[18] "Where there is no evidence to support a finding that the delay was for the purpose of obtaining a confession, there is no evidence that the delay had a coercive effect on the confession, there is no causal connection between the delay and the confession, and the confession was otherwise voluntarily given … the defendant has not shown prejudice by the delay." *United States v. Mullin*, 178 F.3d at 342 (citing *United States v. Perez-Bustamante*, 963 F.2d 48, 53 (5th Cir. 1992)).

would both be present for witness interviews, in this instance, BPA Lopez conducted the interviews while BPA Rivera-Cortes completed the corresponding administrative paperwork.

Moreover, Defendant's interview lasted forty-five minutes. The average time to interview every other witness was between thirty and forty-five minutes. (Dkt. No. 43 at 54). Thus, it can hardly be said that the delays in this case were "for the purpose of interrogation" or that they resulted in a "prolonged interrogation," warranting suppression. The delay in this case was attributable to legitimate law enforcement activities related to the processing of a large group of suspects. Thus, the Court finds that the delay in obtaining Defendant's confession was justified and that Defendant has failed to establish a *McNabb–Malory* violation.

## III.   <u>Recommendation</u>

For the foregoing reasons, the Court **RECOMMENDS** that the District Judge **DENY** Defendant's Motion to Suppress. (Dkt. No. 31).

## IV.   <u>Notice of Right to Object</u>

Within fourteen days after being served with a copy of this Report and Recommendation, the parties may file written objections to the findings and recommendations proposed above. 28 U.S.C. § 636(b)(1). The District Judge will review *de novo* those portions of the report or specified proposed findings or recommendations to which the party objects. The District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by this Court, and may also receive further evidence or recommit the matter to this Court with instructions. *Id.* The District Court need not consider frivolous, conclusive, or general objections. *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). If a party does not object within fourteen days, the party forfeits its right to District Court review. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review

by the District Court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of plain error or manifest injustice.

SIGNED on August 6, 2019.

John A. Kazen
United States Magistrate Judge